*Notice:* This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 18-CF-599 & 18-CF-606

TERRENCE N. ATCHISON & BARRY G. BLOOMFIELD, APPELLANTS,

V.

UNITED STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CF3-2335-16 & CF3-2337-16)

(Hon. Danya A. Dayson, Trial Judge)

(Submitted March 17, 2020                    Decided August 19, 2021)

*Sean R. Day* was on the brief for appellant Atchison.

*Gregory M. Lipper* was on the brief for appellant Bloomfield.

*Jessie K. Liu*, United States Attorney at the time the briefs were filed, and *Elizabeth Trosman*, *Suzanne Grealy Curt*, *Brittany Keil*, *Melissa Jackson*, and *Michael E. McGovern*, Assistant United States Attorneys, were on the brief for appellee.

Before THOMPSON and BECKWITH, *Associate Judges*, and FISHER, *Senior Judge*[*].

Opinion for the court by *Associate Judge* THOMPSON.

Dissenting opinion by *Associate Judge* BECKWITH at page 29.

---

[*] Judge Fisher was an Associate Judge at the time the case was submitted. His status changed to Senior Judge on August 23, 2020.

THOMPSON, *Associate Judge*: A jury convicted appellants Terrence Atchison and Barry Bloomfield of aggravated assault while armed ("AAWA"), two counts of assault with a dangerous weapon ("ADW"), assault with significant bodily injury while armed ("ASBIWA"), ASBIWA against a minor, five counts of possession of a firearm during a crime of violence or dangerous offense, unlawful possession of a firearm, and destruction of property. On appeal appellants argue that the trial court erred in declining to suppress Global Positioning System (GPS) data from their ankle monitoring devices; abused its discretion in allowing evidence of generalized inter-community hostility between the appellants' neighborhoods and that of the victim; and deprived them of due process and of their right to present a complete defense by barring them from rebutting the government's evidence of inter-community feuding with evidence of intra-community violence involving one of the shooting victims. In addition, appellants contend that the evidence was insufficient to show that they participated in, or aided or abetted, the shooting. Although we agree with appellants that the proffered evidence of intra-community violence was not third-party perpetrator evidence that the trial court was required to exclude under *Winfield*,[1] we are

---

[1] *Winfield v. United States*, 676 A.2d 1 (D.C. 1996) (en banc).

persuaded that any error in excluding the evidence was harmless beyond a reasonable doubt.  Because we reject appellants' other arguments, we affirm.

## I.

The charges against appellants arose out of the February 12, 2016, shooting of Andre Wilkinson and his twenty-two-month-old son, B.T., at Wrenn's Barbershop (the "barbershop"), located at 1005 Eighth Street, S.E.  The evidence at trial established that at around noon on that day, Wilkinson went to the barbershop with B.T.  Wilkinson sat in a chair, holding B.T. in his lap, while he waited for service.  Several witnesses recounted what occurred while Wilkinson continued to wait.  Janine Daugherty testified that she saw three people dressed in black wearing masks at the door of the barbershop.  Barbers Harold Chatman and Sheila Knox testified that they looked up from their customers and saw two masked men.  Chatman saw one of the masked men pull a black gun from his front waistband.  Daugherty "saw an arm come in" and start shooting.  Chatman, Daugherty, and Knox all testified that the gunfire was directed at Wilkinson and his son.  Knox and Chatman testified that they heard two sets of shots and saw a

gunman firing in Wilkinson's direction, while Daugherty testified that she saw two men shooting in his direction.  Wilkinson testified that he saw a person with a covered face at the door to the barbershop, and that he dove to the ground when he saw the person reach for his waist.  Once the masked men left the barbershop, Knox went outside and flagged down an ambulance that was driving by.  Both Wilkinson and B.T. were wounded and were taken to hospitals.

Edward Zeigler, who was in a vehicle going south on Eighth Street near L Street at the time of the shooting, testified that he heard gunshots and then saw three men, all wearing ski masks, running down the sidewalk away from the barbershop.  Zeigler testified that while exiting the barbershop, the third man "paused[,] . . . raised up his arm and . . . fir[ed] multiple shots [from a handgun] into the salon."  The three men then ran around the corner onto L Street.  Zeigler saw no one else outside the barbershop.  Stephanie Yeager was walking north on Eighth Street near L Street at the time of the shooting.  She heard gunshots and then saw "at least two" people dressed in black with covered faces run away from the barbershop and get into a white SUV that was facing west on L Street.  Yeager looked in the other direction momentarily, and when she looked back in the direction where she had seen the white SUV, it was gone.  Clifton Jenkins, who lived above the barbershop, testified that he saw a white car parked on L Street

approximately twenty minutes prior to the shooting. A residential security camera captured the sounds of the barbershop gunfire at 1:40 p.m., and the video footage showed the white SUV, just a minute later, on L Street.

Metropolitan Police Department ("MPD") Patrol Officer Sarah Mickey testified that, in response to an increase in violent crimes in the Greenleaf Gardens neighborhood and the adjacent James Creek and Syphax Gardens neighborhoods in the southwest quadrant of the District of Columbia, she and her partner, Officer James Jacobs, had been assigned to special beats covering those areas. During the course of their work, Officers Mickey and Jacobs came to know appellants from James Creek/Syphax Gardens, and Wilkinson from Greenleaf.

Officer Mickey developed a lead relating to the white SUV. Specifically, when she learned that a white SUV had purportedly been used as a getaway car after the shooting at the barbershop, she recalled having seen appellant Bloomfield sitting in the driver's seat of a white SUV on the 1500 block of First Street, S.W. On that occasion, Mickey had run the vehicle's plates and discovered that the car had been rented by Hertz Rent-a-Car ("Hertz") to Michael Ellis about three weeks before the shooting. In the aftermath of the shooting, Mickey contacted Hertz to

see whether Ellis had extended his rental of the white SUV. Hertz confirmed that the car had not been returned to Hertz.[2]

Officer Mickey also recalled that she had previously asked the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") to place a video camera overlooking the parking lot of 1514 First Street, S.W. She put MPD Detective Robert Saunders, who led the investigation into the shooting, in touch with an ATF agent who had access to the video footage. The ATF provided the footage, with the following summary:

> At 13:10, a white car pulls up; and one guy gets out. Five minutes later, six guys come back to the car. Four get in and park.

After receiving the ATF video, Detective Saunders asked Officers Jacobs and Mickey to look at the video individually to see if they could identify any of the men depicted in it. Both officers independently identified the driver as Anthony Chambers (appellant Atchison's brother) and two of the passengers as appellants.[3] Saunders also obtained video evidence from the District of Columbia Department of Transportation and the Marine Barracks that showed the path of the white SUV

---

[2] The car was subsequently reported as stolen on February 13, 2016 (the day after the shooting).

[3] Neither officer was able to identify the third passenger of the car.

between 1:15 and 1:21 as it drove towards the barbershop. Video footage also showed the white SUV heading towards the highway after the shooting. Ballistics evidence showed that three guns were used in the shooting.

On the date of the shooting, both appellants were being monitored by the Court Supervision and Offender Services Agency ("CSOSA") via GPS ankle monitoring devices that CSOSA had required each to wear. As part of his investigation, Detective Saunders searched CSOSA's GPS database to learn whether anyone on CSOSA GPS monitoring was in the vicinity of the barbershop at the time of the shooting. Detective Saunders testified that while the search turned up hits for five individuals who came within 200 feet of the barbershop on the day of the shooting, police discerned from a GPS report that both appellants — but no one else who was being monitored — "appeared to be in front of the [Eighth Street, S.E., barbershop] location" at 1:41 p.m., the time of shooting. More detailed GPS records, which GPS expert Ashley Fuller explained have an approximately fifty-foot margin of accuracy, put the ankle devices for both appellants "close[] to Eighth Street, Southeast" at the time of the shooting. The GPS records also showed that appellant Atchison's ankle device was close to the barbershop earlier in the day, at approximately 12:40 p.m. and that Atchison's coordinates during the time in between his two visits to the barbershop area and

during the time immediately after the shooting were consistent with the path taken by the white SUV as captured by the various security cameras that showed the vehicle.  The GPS records showed the same as to Bloomfield's ankle device during the minutes immediately before and after the shooting.

Police found a ski mask in Bloomfield's bedroom after the shooting.  He was a possible contributor to the DNA mix found on the mask.

## II.

Appellants contend that CSOSA's ankle-monitoring-device GPS surveillance violated their rights under the Fourth Amendment and in addition that CSOSA violated their reasonable expectation of privacy when it shared the GPS data with MPD.  Accordingly, appellants contend, the trial court erred in denying suppression of the GPS data and the fruits of those data.[4]

---

[4]  Atchison filed a motion to suppress the GPS data; Bloomfield joined the motion.

At the time the parties filed their briefs in this appeal, there was pending in this court another case that raised the same Fourth Amendment issues that appellants have raised here. That case, *United States v. Jackson*, has since been decided, *see* 214 A.3d 464 (D.C. 2019), and appellants concede that it "control[s] the outcome" of the Fourth Amendment issues in this case. We agree.

Mr. Jackson had been convicted of armed robbery and sentenced to twelve months' incarceration, with all but four months suspended in favor of a year of probation supervised by CSOSA. *Id.* at 468. Mr. Jackson's court-imposed conditions of probation did not include GPS monitoring, but CSOSA placed him on GPS monitoring after he violated the terms of his probation. *Id.* at 468–69. A few weeks after CSOSA had equipped Mr. Jackson with a GPS monitor, an armed robbery involving two men was reported in the Southeast quadrant of the city. *Id.* at 469. After the incident, MPD ran "a check to determine whether any supervisees under GPS monitoring by CSOSA were at the crime scene at the time of the offense." *Id.* at 470. The check produced two "hits," including one for Mr. Jackson. *Id.* When the police went to the two CSOSA supervisees' homes, they found the vehicle that matched the victim's description of the robbers' getaway car, a bank card in the name of one of the victims, and "some items that may have been in [the other victim's] purse." *Id.*

The trial court sustained a motion to suppress the GPS data and the evidentiary fruits thereof. *Id.* We reversed that ruling, holding that "CSOSA's imposition of GPS monitoring . . . without judicial authorization" was constitutional (even without probable cause or individualized suspicion of wrongdoing) as a "special needs" search of individuals who were under criminal-justice-system supervision. *Id.* at 463, 467. We concluded that any "reasonable expectation of privacy [Mr. Jackson had] as a convicted offender on probation was diminished and was outweighed by the strong governmental interest in effective probation supervision to deter and detect further criminal activity on his part and encourage his rehabilitation." *Id.* at 467. We said that Mr. Jackson "had no objectively reasonable expectation that CSOSA would withhold the GPS tracking data from the police." *Id.*

Here, for the same reasons we articulated in *Jackson*, we conclude that CSOSA's GPS surveillance of appellants did not offend the Fourth Amendment, and that CSOSA did not violate any reasonable expectation of privacy when it shared appellants' GPS data with the MPD. Like Mr. Jackson, Atchison wore an ankle monitoring device while on probation, while Bloomfield wore his device while on supervised release. Both appellants were, like Mr. Jackson, proper

subjects of a special needs search, and neither could have had a reasonable expectation that CSOSA would not share their GPS data with other government agencies. *Id.* Bloomfield asserts in his reply brief that "it makes little sense to treat parole [involved in cases that the government's brief cites] and supervised release identically," because a parolee has had his sentence cut short and is serving the remainder of his time outside of prison, while an individual on supervised release has completed the entire term of imprisonment to which he was sentenced and should not have his rights diminished. Bloomfield's argument may also imply that it is unreasonable to treat probation (as was involved in *Jackson*) and supervised release identically since a probationer has avoided serving all or part of a sentence. We are not persuaded by these arguments, as the entire premise of supervised release is that the individual remains at risk of re-offending and is in need of supervision to deter recidivism and encourage rehabilitation. *See, e.g.*, *United States v. Johnson,* 529 U.S. 53, 59 (2000) (observing that supervised release "fulfills rehabilitative ends"); *United States v. Siegel*, 753 F.3d 705, 708 (7th Cir. 2014) ("Reducing recidivism is the main purpose of supervised release[.]"). In addition, here, as in *Jackson,* the fact that CSOSA rather than the court required that the monitoring devices be worn did not render the "search" unlawful. *See Jackson*, 214 A.3d at 467–68. We therefore see no reason why the reasoning of *Jackson* should not govern appellants' Fourth

Amendment claims in this case. Accordingly, we conclude that the trial court did not err in denying the motion to suppress.

## III.

Prior to appellants' trial, the government filed a notice of its intent to introduce evidence that there were, in the neighborhoods near the barbershop, "two different rival, feuding groups, [and] hostility between these two groups." The prosecutor told the court that the government did not intend to "introduce any evidence of criminal conduct by either of the groups" or to refer to either of the two groups as a "crew" or "gang" (and the trial court instructed the prosecutor not to use any "non-geographic" epithets for the neighborhoods that would suggest that crews or gangs were involved).[5] The government explained that it was "the association with the neighborhoods that would be part of the motivation for why this particular individual in the car went with these individuals to that barber

---

[5] The prosecutor had explained that individuals in the Greenleaf neighborhood referred to their area as "Killer K Street," among other epithets, while those in Syphax referred to their area as "1st and Pistol," among other names.

shop." The parties eventually agreed to limit the scope of the testimony to the proposition that "there [was] an uptick in violent assaults between the two neighborhoods, and that the neighborhoods have a rivalry where they typically would not be in each other's neighborhood, even though they were close together." Pursuing that same theme during opening statements, the prosecutor told the jury that victim Wilkinson and appellants came from different neighborhoods and that "[t]hose two neighbor[hood]s had a long running historic rivalry, a feud, that had been going on and was going on at the time of this shooting."

Appellants contend that the trial court abused its discretion by allowing the government to introduce and argue generalized evidence of inter-community hostility between their neighborhoods and Wilkinson's neighborhood. Appellants refer, for example, to the government's argument that "[i]t was Greenleaf versus people from the Syphax community[]"; Officer Jacobs's statement that "certain individuals only stayed in certain neighborhoods"; Officer's Mickey's testimony that "[i]f I saw someone from either side [in the other neighborhood], it would – it would seem off to me[]"; and Detective Saunders' testimony that there was violent "feud[ing]" between Greenleaf and the other two neighborhoods. Appellants contend that such "generalized neighborhood-feud evidence[]" was insufficient to meet the standard of admissibility that this court has set forth for gang-affiliation

evidence, because it was devoid of "any evidence linking the defendants to any past feuding or any past acts of violence" or gang or crew activity, and likewise devoid of any evidence of a specific conflict between appellants and victim Wilkinson. Appellants also contend that the generalized-hostility evidence was irrelevant and that their trial was tainted by "motive-by-residence" and guilt-by-habitation evidence.

The trial court offered defense counsel a choice between a ruling that would allow the government to introduce "specific acts" of violence between the neighborhoods, or a "sanitized version" whereby the government would be limited to arguments and evidence referring to general animosity between the neighborhoods. The government argues that having chosen the latter (by urging the court to "mak[e] sure nothing else was going to come in with respect to assaults[,]"), appellants now are foreclosed from making an argument contrary to the position they took in the trial court.[6] But appellants contend that the choice the trial court offered was really no choice at all because the government actually had no specific evidence of violence or gang activity by either appellant. They argue

---

[6] *See Brown v. United States*, 627 A.2d 499, 508 (D.C. 1993) ("We have repeatedly held that a defendant may not take one position at trial and a contradictory position on appeal.").

that the evidence that was introduced was substantially more prejudicial than probative.

We conclude that appellants' arguments on these issues are not foreclosed, but we also conclude that the evidence of inter-neighborhood hostility that the court allowed the government to present was neither irrelevant nor substantially more prejudicial than probative. The "threshold for relevance" is "relatively low"; to be relevant, evidence need only have "some logical tendency to prove or disprove a fact which is at issue in the trial[]" and "to make the existence or nonexistence of a fact more or less probable than would be the case without that evidence." *Williams v. United States*, 77 A.3d 425, 433 (D.C. 2013). The facts that appellants were from neighborhoods in which there was general hostility to victim Wilkinson's neighborhood, and that it was "off" for appellants to be in Wilkinson's neighborhood at the time of the shooting, made it at least slightly more likely than not that appellants were involved in the shooting. Although no evidence of gang activity by appellants or others in their neighborhoods and no evidence of appellants' bearing any hostility toward Wilkinson was proffered or presented, situating the barbershop shooting within the framework of broader inter-neighborhood tensions "suppl[ied] . . . a motive for an otherwise unexplained [assault]." *Bryant v. United States*, 148 A.3d 689, 698 (D.C. 2016) (quoting *Lazo*

*v. United States*, 930 A.2d 183, 185 (D.C. 2007)).  At the same time, given what we perceive to be (and what we think jurors would have perceived to be) the weakness of this motive-by-habitation evidence in implicating appellants in particular,[7] we are satisfied that the evidence was not substantially more prejudicial than probative and that the trial court did not exercise its discretion erroneously in admitting and allowing the inter-neighborhood-hostility evidence and argument.

## IV.

During her opening statement, counsel for appellant Atchison told the jury that while the government argued that the shooting was "about neighbors not getting along," it had "neglected to tell" the jury that after Wilkinson was shot on February 12, 2016, he "was taken to the hospital . . . and . . . placed under arrest while at the hospital [for a burglary in his own neighborhood]."  The government made a relevance objection, explaining that Wilkinson had been acquitted of the

---

[7] Appellant Atchison characterizes the government's generalized motive evidence as "weak" and "incomplete[]."  Bloomfield asserts that the government's inter-community hostility evidence was "weakly probative of motive" and "far weaker" than the prosecutor suggested.  We agree.

charges that formed the basis for his arrest while in the hospital. Atchison's counsel responded that because the court had allowed the government to argue that the "neighborhoods did not get along," appellants should be permitted to argue that "the crime [Wilkinson] was accused of committing happened in his own neighborhood," and therefore "not only did [Wilkinson] supposedly have problems with [the] other neighborhood[s], but he . . . ha[d] problems with his own neighborhood[.]" The trial court struck the reference to Wilkinson's arrest, but permitted Atchison's counsel to state that Wilkinson "may have had problems in his own neighborhood."

The following day, Atchison's counsel argued again that evidence of Wilkinson's arrest ought to be admissible for the purpose of "rebutting the [g]overnment's inference that this was just some historical feud between neighborhoods and the motive is the feud." The trial court responded that counsel's argument raised a potential third-party perpetrator defense and asked the defense for a proffer under *Winfield*. The prosecutor agreed that *Winfield* governed, asserting that the defense was making "a backdoor attempt . . . to put in front of the jury th[e] idea of another suspect[.]" Atchison's defense counsel conceded at trial that she could not make the requisite showing for a *Winfield* proffer. However, throughout the discussions of this issue, counsel denied that she

was attempting to "say that there was a particular [third-party perpetrator][.]" Rather, she explained, she was merely trying to raise the "quintessential defense [of] attacking the investigation that went into the charging of [appellants]."

The trial court recognized the defense's right to "discredit[] the caliber of an investigation[.]" The court reasoned, however, that to the extent that "the thrust" [of counsel's intended] cross-examination [was that] this was "a sloppy investigation" because police "did not look for a third-party perpetrator, that does implicate *Winfield*." The court reasoned that it is not possible to cross-examine a police officer about whether he "look[ed] for somebody else with a motive without implying that there was somebody else with a motive."

Appellants contend that, having permitted the government to introduce evidence of inter-neighborhood feuding and violence, the trial court erred in barring them from offering evidence of *intra*-community hostility as rebuttal evidence. They assert that the trial court thereby deprived them of due process and undermined their Sixth Amendment right to "a meaningful opportunity to present a

complete defense,"[8] by preventing them from rebutting the prosecution's case with "defense evidence in kind."

As noted, the trial court precluded the evidence appellants wished to present on the ground that it was third-party perpetrator evidence subject to the requirements of *Winfield*. *Winfield* establishes that third-party perpetrator evidence is admissible only if it "tend[s] to indicate some reasonable possibility that a person other than the defendant committed the charged offense." 676 A.2d at 4. To indicate such a reasonable possibility, the defense "ordinarily" must have "proof that [a third-party] had the practical opportunity to commit the crime, including at least inferential knowledge of the victim's whereabouts." *Id.* at 5. Thus, third-party perpetrator evidence is not admissible "based solely upon who had a motive or ill will against the victim at the time of [the crime's] commission[.]" *Id.* at 5 n.5. Further, third-party perpetrator evidence must be excluded if it is "too speculative with respect to the third party's guilt." *Ashby v. United States*, 199 A.3d 634, 658 (D.C. 2019).

---

[8] *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)).

Appellants argue that they "w[ere] not offering a *Winfield* defense." We are persuaded by this argument. Although the issue presents a close question, we think it is most apt to say that the defense evidence was designed only to meet the government's generalized motive evidence, not to point the finger at or cast suspicion on a "hypothetical . . . unidentified, unknown person with only generic reasons for committing the crime." *Gethers v. United States*, 684 A.2d 1266, 1271 (D.C. 1996). Admission of the evidence would not have left the jurors to speculate that an (unidentified) third person (rather than appellants) was involved in the shooting; rather, it would have enabled jurors to recognize (perhaps more clearly than they did already) that the government's generalized motive evidence was not particularly probative of the shooters' identity. That intended use of the evidence was not the "ordinar[y]" use that *Winfield* addressed. *Winfield*, 676 A.2d at 5. Further, the evidence that Wilkinson was accused of burglarizing a victim in his own neighborhood was not evidence that had "only a weak logical connection to the central issues in the case." *Holmes v. South Carolina*, 547 U.S. 319, 330 (2006). That is because, unlike the government's generalized motive evidence, the defense evidence that was excluded offered a reason specific to Wilkinson about why there may have been hostility toward him within his own neighborhood.[9]

---

[9] Exclusion of this evidence while allowing the government's inter-neighborhood hostility evidence was analogous to the situation we addressed in

(continued…)

Moreover, we agree with appellants that this is an instance in which the *Winfield* rule, even assuming it applies, possibly[10] had an impact "disproportionate to the ends [it is] asserted to promote." *Holmes*, 547 U.S. at 326.

For the foregoing reasons, we conclude that the trial court erred in reasoning that *Winfield* required exclusion of the defense evidence. We are satisfied, however, beyond a reasonable doubt, that exclusion of the evidence was harmless.[11] As we discuss further below, the government's GPS tracking, video surveillance, and flight evidence was strong. In addition, as we have said, the

_____

(…continued)
*Headspeth v. United States*, 86 A.3d 559 (D.C. 2014). We reasoned that it was error for the trial court to give the jury an instruction that permitted them to infer consciousness of guilt from the defendant's flight from a particular police officer, when "the jury had no knowledge of the history between [the defendant] and [the police] [o]fficer" that "would have given [the defendant] a particular aversion to be restrained by [the] [o]fficer." *Id.* at 567 (noting that jurors "were ignorant of the history that might have [otherwise] explained [the defendant's] reaction").

[10] We say "possibly" because the trial court did not evaluate, and we express no opinion on, whether the evidence was excludable on other grounds, such as its potential for distraction of the jury or confusion of the issues. *See Winfield*, 676 A.2d at 5.

[11] Our case law establishes that where the excluded evidence was proffered to show a reasonable possibility that someone else committed the crime, we must determine whether exclusion of the evidence was harmless beyond a reasonable doubt. *See Brown v. United States*, 932 A.2d 521, 526 n.6 (D.C. 2007). We assume without deciding that the same standard applies here even though, for the reasons discussed in the text, we are persuaded that the excluded evidence was not *Winfield* evidence but had a different and legitimate defense purpose.

government's generalized motive evidence was weak even if unrebutted by the excluded defense evidence, and nothing in that generalized evidence specifically tied either appellant to the shooting. Moreover, defense counsel was permitted to and did argue the weakness of the generalized motive evidence, and to argue that Wilkinson may have had problems in his own neighborhood. We are satisfied that the verdicts were not swayed by exclusion of the evidence of Wilkinson's burglary arrest (that was proffered as intra-neighborhood hostility evidence).

## V.

Finally, appellants argue that the evidence was insufficient to show that they personally participated in, or aided or abetted, the shooting. Our review of this claim is *de novo*. *Nero v. United States*, 73 A.3d 153, 157 (D.C. 2013). We "view[] the evidence in the light most favorable to the government, giving full play to the right of the fact finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact." *Tornero v. United States*, 161 A.3d 675, 685 (D.C. 2017) (internal quotation marks and brackets omitted). The threshold for

insufficiency can be met only where "we conclude, as a matter of law, that no reasonable juror . . . could convict on the evidence presented." *Id.*

In order to prove each of the appellants guilty under an aiding and abetting theory, the government had to prove that each had a purposive attitude toward the shooting, i.e., "associate[d] himself with the venture[,]" "participate[d] in it as in something that he wishe[d] to bring about," and "s[ought] by his action to make it succeed." *Walker v. United States*, 167 A.3d 1191, 1201‒02 (D.C. 2017). In addition, to prove appellants' guilt of AAWA under an aiding and abetting theory, the government had to prove that each "himself intended to cause serious bodily injury or acted with extreme indifference to human life[,] because he knew either that the principal would commit an assault with such intent, or that the principal would intentionally engage in an assaultive act that actually created a grave risk of serious bodily injury." *Perry v. United States*, 36 A.3d 799, 817 (D.C. 2011). Further, to convict appellants as aiders and abettors with respect to any of the armed offenses with which they were charged (AAWA, ADW, ASBIWA), "there must [have been] evidence to support a reasonable inference that the accomplice was aware the crime would be committed while armed." *Id.* at 813 (internal quotation marks omitted).

In arguing that the evidence was insufficient to convict either of them as principals in the shooting, appellants emphasize that four individuals got into the white SUV before the shooting and fled the area right after the shooting, and that the government's evidence did not pinpoint them as the shooters (instead of, for example, as companions who were merely present at the scene). Appellants also emphasize that no testimony or physical evidence suggested that there were more than three shooters; therefore, they contend, even when the evidence is viewed in the light most favorable to sustaining the convictions, neither appellant was conclusively shown to have been one of the three shooters, rather than merely the fourth man in the white SUV. Additionally, Atchison emphasizes the lack of physical evidence tying him to the shooting, and Bloomfield stresses that the witnesses' descriptions of the masked shooters are incompatible with his age and build (twenty-six years old and six foot one at the time of the shooting). Specifically, he notes, Knox described the masked men as "short" "kids" or "young boys" who were "skinny," and Daugherty, who testified that she is "five foot nine and a half," described the tallest of the shooters as being around her height.

We are satisfied that the evidence was sufficient for the jury to find that each appellant was one of the shooters. Contrary to appellants' contentions, the

circumstantial evidence presented at trial established more than appellants' mere presence at the scene (although data from appellants' ankle device GPS records and the audio of the surveillance footage that captured the sound of the gunshots, which were consistent with each appellant's ankle device being in front of the barbershop at the precise time of the shooting, were important pieces of the government's evidence).[12]  First, Zeigler saw no one else in front of the barbershop when he saw the three masked men run away, permitting the jury to infer from his testimony, and from the GPS records, that appellants were two of the three masked men who, according to Yeager's testimony, got into the white SUV that left the area immediately thereafter.  In addition, the government presented evidence that (1) appellants and Wilkinson belonged to rival neighborhoods, (2) Atchison had the opportunity to learn Wilkinson's whereabouts when he went to the barbershop

---

[12]  Our dissenting colleague emphasizes the testimony by GPS expert Fuller that the GPS data, which were accurate within about 50 feet, showed only the approximate location of appellants' ankle bracelets/GPS receivers rather than their exact location.  But appellants agree that the GPS data together with the other evidence permit an inference that appellants traveled to the barbershop vicinity before the shooting in a white SUV, were there during the shooting, and left there afterwards.  Appellant Bloomfield's brief acknowledges that "[a]t most, [Bloomfield] was placed in the car that the shooters rode to and from the barbershop" and that "[a]t most, the evidence established that [Bloomfield] was in the car that the shooters rode to the barber shop."  Appellant Atchison's brief acknowledges that "GPS maps showed the ankle bracelets assigned to Atchison and Bloomfield going to, at, and from the barbershop vicinity near the time of the shooting."

prior to the shooting, (3) within a few weeks before the shooting, Bloomfield had been seen in a car that looked like the getaway car (the white SUV) used by the assailants, (4) Chambers was the driver of the white SUV that drove with three passengers, including the two appellants, toward the barbershop,[13] (4) three different guns were used in the shooting, and (5) Bloomfield had a ski mask in his bedroom that was potentially linked to his DNA. Taken together, the evidence permitted the jury reasonably to infer that Atchison knew that Wilkinson was in the barbershop, that Bloomfield arranged for transportation in the white SUV to the barbershop before the shooting and for the vehicle to provide get-away transportation after the shooting, and that there were three shooters (i.e., that all three masked men whom Zeigler saw were shooters), including appellants. The jury could reasonably reject any other explanation for the foregoing evidence as too much of a coincidence to support any other conclusion.[14]

---

[13] As noted earlier, the still photograph from the ATF surveillance camera enabled Officers Mickey and Jacobs to identify appellants as two of the four men who climbed into the white SUV before the shooting and before the vehicle drove toward the barbershop. As also noted earlier, per GPS data and video surveillance footage, appellants' movements during the twenty minutes before the shooting matched the path of the white SUV and their movements after the shooting matched the path of (what Atchison concedes was) the vehicle's flight.

[14] "Coincidences happen, but an alternative explanation not predicated on happenstance is often the one that has the ring of truth." *Poulnot v. District of Columbia*, 608 A.2d 134, 139 (D.C. 1992).

As to the physical description of the shooters that differed from Bloomfield's physical characteristics, the discrepancy "affected only the weight of the evidence, not its sufficiency[.]" *United States v. Bamiduro*, 718 A.2d 547, 552 (D.C. 1998); *see also Lewis v. United States*, 930 A.2d 1003, 1011 (D.C. 2007) (noting that this court has previously rejected claims of insufficiency "[e]ven if discrepancies exist between the witness' description of the defendant and his actual appearance") (quoting *Hill v. United States*, 541 A.2d 1285, 1287 (D.C. 1988)). This is not a case in which there was "no evidence upon which a reasonable mind could fairly conclude . . . beyond a reasonable doubt," *Harris v. United States*, 668 A.2d 839, 841 (D.C. 1995), that appellants were among the men involved in the barbershop shooting.

We can agree that the evidence did not compel the jury to find that either appellant was an actual shooter. But even if jurors were not persuaded of appellants' guilt on that basis, the evidence was sufficient for them to find that each of the appellants participated with a purposive attitude toward the shooting. To repeat, the evidence permitted the jury reasonably to infer that Atchison surveilled the barbershop before the shooting, and that Bloomfield arranged for the white SUV to provide transportation to the barbershop and a swift get-away to the highway after the shooting. This is precisely the type of evidence that we have

said "supports an inference that [appellants] participated in the crime from the beginning and took steps to make it succeed." *Robin v. United States*, Nos. 12-CF-802 & 12-CF-925, 2015 D.C. App. LEXIS 256, at *13 (D.C. 2015).

We are also satisfied that the evidence permitted the jury to find that each appellant had the *mens rea* required of an aider/abettor of AAWA and the other while-armed offenses of which they were convicted. The evidence that permitted the jury to infer that appellants were two the three masked men seen leaving the barbershop also permitted an inference that appellants sought to disguise themselves as they participated in a crime. And although several witnesses described what occurred at the barbershop, none described any crime or attempted crime other than the assault from outside the barbershop, targeted at Wilkinson, using a method (firearms) that would be effective from the outside.[15] In other words, the evidence supported an inference that the shooting was not merely an unforeseen result, but the entire purpose of the group's trip to the barbershop. The assailants did not, for example, enter the barbershop and approach Wilkinson as if to start a fistfight, or try to take his belongings or those of other patrons or workers

---

[15] A ballistics expert testified that the shell casings were found outside the barbershop (except for a few found just inside the door of the barbershop), and witnesses testified that they saw the shooters' arms reach into the barbershop or saw a shooter in the doorway.

and end up shooting Wilkinson and B.T. in the process. So the jury could infer that the while-armed assaults were the crimes with which appellants associated themselves. In addition, the jury could reasonably infer that appellants' participation in a venture involving use of a gun to commit assault constituted acting either with an intent to cause serious bodily injury or with "extreme indifference to human life[.]" *Perry*, 36 A.3d at 817.

For all the foregoing reasons, the judgments of conviction are

*Affirmed.*

BECKWITH, *Associate Judge*, dissenting: The jury in this case had a basis to infer that at least four men traveled in a white SUV to the vicinity of Wrenn's barbershop, that appellants Terrence Atchison and Barry Bloomfield were among them, that twenty minutes later two or three men fired gunshots into the barbershop, and that the shooters then ran to the SUV and fled the area with the others in that vehicle. No eyewitness identified Mr. Atchison or Mr. Bloomfield as one of the shooters,[1] and no ballistics or DNA or fingerprint evidence placed them

---

[1] The eyewitnesses' descriptions conflicted particularly starkly with Mr. Bloomfield's appearance. Mr. Bloomfield was 6 foot 1. One witness testified that the tallest person was 5 foot 9 inches tall, and another described the shooters as
(continued…)

at the barbershop door. As the prosecutor acknowledged in opening statement, "nobody, not the victim, not anybody else in that barbershop, could identify them, could say who it was who was pulling the triggers," and "they didn't go inside the barbershop and roll around leaving their DNA and prints everywhere."[2] The proof was "insolubly ambiguous"—as consistent with the men being unwitting passengers or companions who knew about the shooting and tried to stop it. *See Peery v. United States*, 849 A.2d 999, 1002 (D.C. 2004) (quoting *Rivas v. United*

_____

(…continued)

"small" "skinny" people who "looked like kids." My colleagues in the majority contend that these discrepancies go to the weight of the evidence, *ante* at 26, but that rule applies only where there is ample evidence of identity apart from any inaccurate descriptions. *See, e.g.*, *Beatty v. United States*, 544 A.2d 699, 703 (D.C. 1988) (finding insufficient evidence of identity in a robbery case where all testimony about "the identity of the bagman was inconsistent with [the defendant]"); *Crawley v. United States*, 320 A.2d 309, 312 (D.C. 1974) (reversing conviction on sufficiency grounds based in part upon the "significant discrepancy . . . between the description given by the complainant to the police and appellant's actual description"); *United States v. Bamiduro*, 718 A.2d 547, 551 (D.C. 1998) (finding sufficient evidence of identity where the evidence overall "lent" the identification "very substantial corroborative force" and where "the discrepancies were too slight to mistrust the jury's ability to resolve them"). Here, no witness gave any testimony regarding the assailants' appearance that compensated for the dearth of other evidence regarding the identity of the shooters. *Lancaster v. United States*, 975 A.2d 168, 171 (D.C. 2009) ("In considering sufficiency of the evidence when identification is at issue, we must focus on the reliability of the identification.").

[2] The prosecutor also stated that when the police executed a search warrant at Mr. Atchison's house, "there was nothing. Nothing at all." And it was not remarkable that a ski mask found at Mr. Bloomfield's home may have had his DNA on it.

*States*, 783 A.2d 125, 137 (D.C. 2001) (en banc)).

To compensate for the lack of evidence that Mr. Atchison and Mr. Bloomfield were among the actual shooters at the barbershop—and to prove that they were not just aware of or in the vicinity of the shooting, or merely along for the ride with the actual shooters—the government relied on the testimony of its GPS analyst, Ashley Fuller, and her interpretation of the data taken from GPS ankle monitors both men were wearing that day.[3]  This strategy hit a snag, however.  Ms. Fuller's testimony failed to substantiate the storyline that the prosecutors presented to the jury in opening and closing statements, a narrative that culminated in the assertion that Mr. Atchison and Mr. Bloomfield were "right in front of the barbershop" at the time of the shooting.  Instead, Ms. Fuller's testimony confirmed that the GPS data did not place Mr. Atchison and Mr. Bloomfield in the position of the shooters.

Still, my colleagues in the majority conclude that evidence that Mr. Atchison and Mr. Bloomfield were present in the area was enough to prove they were shooters.  Our binding precedent compels the opposite conclusion.  *See, e.g.*, *United States v. Bailey*, 416 F.2d 1110, 1118 (D.C. Cir. 1969) (finding insufficient

---

[3]  The court allowed Ms. Fuller to testify as an expert in "the integration in GPS technology into the VeriTracks software system."

evidence of guilt where Mr. Bailey's conduct "amounted to presence at the scene of the crime, slight prior association with the actual perpetrator, and subsequent flight"); *see also Hicks v. United States*, 150 U.S. 442, 450 (1893) (affirming that presence at the scene of a crime does not constitute guilt); *Acker v. United States*, 618 A.2d 688, 689 (D.C. 1992) ("[M]ere presence at the scene of a crime committed by someone else, even with knowledge that an offense has been committed is insufficient to sustain a conviction as an aider or abetter."); *Bolden v. United States*, 835 A.2d 532, 535 (D.C. 2003) (same). Because Ms. Fuller was clear that the GPS data did not support the prosecutor's attempt to place Mr. Atchison and Mr. Bloomfield where the shooters would have been and because nothing else in the record specifically implicated them, "[t]he jury could only speculate as to appellant[s'] actual role" in the shooting. *Speight v. United States*, 599 A.2d 794, 798 (D.C. 1991). This court should vacate these men's convictions because no reasonable juror could find beyond a reasonable doubt that Mr. Atchison or Mr. Bloomfield committed or aided and abetted the shootings in this case.

The constitutional right to due process "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970); *see also Sandstrom v. Montana*, 442 U.S. 510, 524 (1979); *Francis v.*

*Franklin*, 471 U.S. 307, 324–25 (1985). In this case, that means (among other things) establishing that those who were on trial for the assaults and gun crimes were the people who committed the shooting at the barbershop or aided and abetted its commission.

The GPS reports—as interpreted and explained to the jury by Ashley Fuller—were the basis for the government's contention that Mr. Atchison and Mr. Bloomfield fired shots into the barbershop that day and were therefore guilty as principals. Yet there is no testimony or exhibit in the record supporting what the prosecutor said in opening and closing—that GPS records "showed that they were standing directly outside Wrenn's barbershop at the very time shots were fired into the store" and "that each was in front of the barbershop at the precise time of the shooting." Ms. Fuller did not draw such a conclusion from the GPS data she analyzed. She made clear, in fact, that the data would not substantiate the prosecutor's statements. Throughout her testimony, she emphasized the limitations of the GPS system's ability to pinpoint the location of the device (and thus of the person reasonably presumed to be wearing the device). She noted, for example, that "the satellites move at 7,000 miles an hour so there is a fair amount of movement that's going into play during the calculations of locations." She repeatedly underscored the 50-foot margin of accuracy and stated that certain

environmental factors—like a cluster of buildings, a body of water, or a large structure, such as a brick, cinderblock, or commercial construction—can create an environment unfriendly to GPS that can impair the communication between the satellite and the device and "can extend the margin of accuracy to upwards of 150 feet."[4]  Ms. Fuller emphasized accordingly that the red dots on the GPS maps indicating minute-by-minute reports of longitude and latitude did not represent the actual location of the GPS devices.  She could not tell whether the devices were inside or outside or stationary or moving, and she testified that the straight red lines between the coordinates plotted on the report did not show a suggested route or indicate the exact path the device traveled.  She further testified that she could not tell by looking at a particular dot on the map what the path of someone's travel was, that she had "no idea how a person might have gotten anywhere," and that she had "no idea how the device might have gotten from one point to the next."  *See* Trial Tr. 428, Feb. 22, 2018 ("I can't tell you where he might be located."), *id.* at 432 ("I never said Mr. Atchinson [sic] was anywhere."); *id.* at 463–64 ("I can't testify about where Mr. Atchinson [sic] was located"—only where the device was within the margin of accuracy).

---

[4]  She named Nationals Park as an example of a large structure present on the map the prosecutor showed her, and she agreed that the nearby Anacostia River was "a body of water that is local."  *Id.* at 380–81, 423, 481–485.  She never testified that these environmental factors were not in play here.

Ms. Fuller was the only witness who could potentially link Mr. Atchison and Mr. Bloomfield to the actual shooting. She was the witness the government promised would compensate for the absence of eyewitness and physical evidence in that regard. Yet by the end of her testimony, Ms. Fuller had made clear that at least in this case, the GPS data was not susceptible of the government's interpretation and that the specific location of two coordinates on a map did not demonstrate the proximity of two devices (and of two people wearing those devices). Put simply, she could not place Mr. Atchison and Mr. Bloomfield in front of the barbershop. She could not prove more than presence near the scene of the crime, which, even coupled with evidence of "an accused's prior association with one who is to become a criminal offender . . . does not warrant an inference of guilty collaboration." *Bailey*, 416 F.2d at 1114.

Even if the coordinates were probative of the appellants' specific location—which they were not—Ms. Fuller's testimony still undermined the government's attempt to place the two men together in front of the barbershop at the critical moment. When the prosecutor sought to elicit testimony about the two men's precise location at the time of the shooting, for example, Ms. Fuller testified that the closest street to Mr. Bloomfield was Virginia Avenue, and the closest street to Mr. Atchison was L Street. She said no to the question whether she could tell "if they had gone down Eighth Street and over to L Street and back around, or if they

went directly to, I think that's Virginia Avenue?" *Id.* at 490. And when the prosecutor asked her "when you're looking at those red dots that we were looking at on all the maps . . . can you be more confident in certain red dots' accuracy than others?" she responded, "In general, I can be" but "[i]n this instance, no." *Id.* at 486. In sum, the single expert witness called by the government to explain the GPS data to the jury effectively repudiated the government's theory that the data could place Mr. Atchison and Mr. Bloomfield in front of the barbershop at the time of the shooting—the crux of the government's theory that the two men were principals in this offense.[5]

The government does not have to negate every theory of innocence. *Hawkins v. United States*, 119 A.3d 687, 700 (D.C. 2015). But here, it failed to present evidence to counter Mr. Atchison's and Mr. Bloomfield's most basic assertions at trial—that no evidence placed them at the shooter's location. *See id.* (stating that "the verdict also cannot rest on speculation or unwarranted

---

[5] Although Detective Robert Saunders testified at one point that the GPS placed Mr. Atchison and Mr. Bloomfield "in front of the location," the detective was not an expert qualified to read the report, the jury was instructed to rely solely on the verified data presented through Ashley Fuller's testimony, and the report Saunders was consulting was not introduced for the truth of its contents. The report in question—which, like the reports Ms. Fuller analyzed, was generated by the company VeriTracks, which tracks individuals under GPS supervision—indicated that sixteen GPS-monitored individuals were in the vicinity of the shooting at the time of the shooting.

inferences"). Ashley Fuller's testimony did not support the government's theory that the two men were in front of the barbershop at the same time (or establish their location at the shop's entrance in some other way), and so the evidence is equally consistent with each man just being in the area, perhaps even trying to dissuade the other men. *Peery*, 849 A.2d at 1002 (finding the government's evidence insufficient because "both innocent and guilty explanations for [the appellant's] behavior may exist").

My colleagues in the majority state that even if the government did not present sufficient evidence that Mr. Atchison and Mr. Bloomfield were the shooters, they were guilty under an aiding and abetting theory. The government does not develop any argument in its brief regarding the sufficiency of the evidence supporting the convictions on aiding and abetting grounds. Its main argument is that Mr. Atchison and Mr. Bloomfield were principals in the shooting because their GPS records "show that they were standing directly outside Wrenn's barbershop at the very time shots were fired into the store." But if the government were relying on an aiding and abetting theory, presence and association would not be enough, "even with knowledge that an offense has been committed." *Acker*, 618 A.2d at 689. In order to convict Mr. Atchison and Mr. Bloomfield of aiding and abetting the shooting, the government had to prove that each had a "purposive attitude" toward the shooting, meaning that he "associate[d] himself with the

venture," "participate[d] in it as in something that he wishe[d] to bring about," and "s[ought] by his action to make it succeed." *Wilson-Bey v. United States*, 903 A.2d 818, 831 (D.C. 2006) (en banc) (adopting Judge Learned Hand's purpose-based formulation of the mens rea required for aiding and abetting in *United States v. Peoni*, 100 F.2d 401 (2d Cir. 1938)).

The majority concludes that if Mr. Atchison was not one of the shooters, then the evidence was sufficient to support his convictions on an aiding and abetting theory because Ms. Fuller's testimony that Mr. Atchison's GPS coordinates were in the general vicinity of Wrenn's—around Virginia Avenue and L and Eighth Streets S.E.—at 12:40 p.m. "permitted the jury reasonably to infer that Atchison surveilled the barbershop before the shooting." *Ante* at 27. The government's reliance on the GPS data at trial to demonstrate that Mr. Atchison aided and abetted the shooting by "surveill[ing]" the barbershop was unfounded for the same reason its reliance on GPS evidence to prove the two men were shooters was unfounded. The prosecutor stated in opening that Mr. Atchison was "standing in front of the barbershop" one hour before the shooting. In closing, the prosecutor argued that the shooters "knew where Andre was" because Mr. Atchison "was standing right outside the window at 12:40 watching [Andre Wilkinson] figuring out where he was sitting in that barbershop." Yet nothing in the GPS data or Ashley Fuller's analysis of it supported an inference that Mr. Atchison traveled to

the area, slowed down or stopped, or got out of his vehicle, no less that he stood outside the barbershop while confirming that Andre Wilkerson was inside. As in *Bailey*, "[t]here is no trustworthy indication that [he] was a party to the scheme" and "the record is devoid of evidence disclosing circumstances that could give that sort of color to appellant's conduct." 416 F.2d at 1114 n.28. That is, the record contains no evidence—not in the GPS report, and not in Ms. Fuller's testimony explaining it—indicating that Mr. Atchison's device did anything more than pass through the vicinity of the barbershop, which is located on the main artery of 8th Street between two points: a location where the device had traveled and then remained for nine minutes (near 14th and E Streets S.E.) and the parking lot at First and P Streets S.W. where both appellants' GPS coordinates remained for a time prior to the shooting. Without any testimony from witnesses who saw Mr. Atchison take any relevant action (stop or park or get out of his car, for example) before the shooting, the government's evidence is insufficient to support the prosecutor's contention in closing, *see id.*, and thus insufficient to demonstrate a purposive attitude toward the shooting.

As to Mr. Bloomfield, the majority concludes that the government's evidence "that Bloomfield arranged for the white SUV to provide transportation to the barbershop and a swift get-away to the highway after the shooting" was sufficient evidence that he "participated with a purposive attitude toward the

shooting" and was therefore guilty as an aider and abettor. *Ante* at 27. Again, the government itself does not make this argument, and the record contains no evidence of such an arrangement. The only evidence involving a connection between Mr. Bloomfield and a white SUV is Officer Mickey's testimony that she saw Mr. Bloomfield sitting in a white SUV several weeks before the shooting. This testimony surely does not support a reasonable inference that several weeks later Mr. Bloomfield provided a similar car for the purpose of transporting the men to the barbershop to commit the shooting and getting them away from the scene afterward. *See Perry v. United States*, 276 A.2d 719, 719–20 (D.C. 1971) (holding that, where "the only evidence against appellant was that he was standing in front of the broken window of a store that was being burglarized by two other men, with one of whom he had a casual acquaintance," the evidence, "while perhaps raising a strong possibility or even strong suspicion of participation in the criminal activity, was not sufficient for finding appellant guilty beyond a reasonable doubt"). The theory is further undermined by the evidence that Mr. Bloomfield was not the vehicle's driver and by the lack of evidence that Mr. Bloomfield brought the SUV to the parking lot in Southwest D.C. that day.

The evidence, viewed in the light most favorable to the government, is not sufficient to support a reasonable inference that Mr. Atchison and Mr. Bloomfield were shooters or were aiders and abettors who had a purposive attitude toward the

shooting. Because the jury necessarily acted on "surmise and conjecture, without evidence," *Bailey*, 416 F.2d at 1113 (citation omitted), I respectfully dissent from my colleagues' contrary conclusion.